UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| FALKEN INDUSTRIES, LTD. and ROY JANIS,<br><br>   *Plaintiffs*,<br><br>v.<br><br>CHRISTIAN JOHANSEN and PATRICK SAUTIN,<br><br>   *Defendants*. | Civil Action No. 04-12479 MEL |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS, OR, IN THE ALTERNATIVE, TO STAY AND COMPEL ARBITRATION

### INTRODUCTION

Plaintiffs' unbridled desperation to unfairly and improperly hale two foreign individuals into an American court is revealed by their willingness to play fast and loose with the facts. Those distortions, however, cannot overcome the abundant evidence demonstrating that this action must be dismissed because this Court does not have personal jurisdiction over Sautin and Johansen. Moreover, Plaintiffs' arguments only emphasize that Massachusetts is an inconvenient forum. Finally, Plaintiffs' attempt to avoid arbitration fails.

### ARGUMENT

### I.  THE COURT LACKS IN PERSONAM JURISDICTION OVER DEFENDANTS.

Plaintiffs' affidavits have left Sautin and Johansen flabbergasted; Plaintiffs' accounts do not square with reality. Neither Sautin nor Johansen had any contacts with Massachusetts (other than the random, isolated and fortuitous contacts related in their initial brief and affidavits). At

best, Plaintiffs are grossly mistaken; at worst, Plaintiffs are willing to distort facts to create the appearance of personal jurisdiction where none exists.

**A.    This Court Lacks Jurisdiction Under Massachusetts Law.**

Plaintiffs' response is not only filled with unsubstantiated statements by interested parties,[1] but the contacts they allege – even if taken at face value – are not sufficient to bring Defendants into a Massachusetts court.

    1.    <u>Sautin Did Not Solicit Janis to Invest In Falken.</u>

Janis claims that he was approached by Sautin prior to Nickel Ltd.'s transfer of the Clean Plus product line to Falken and that Sautin solicited and induced him to become an investor and director of Falken. <u>See</u> Janis Dec. at ¶¶ 4-18. The transfer of Clean Plus took place on August 28, 2003. (<u>See</u> Supplemental Declaration of Patrick Sautin ("Supp. Sautin Dec. – Dismiss") at ¶ 2, attached as Exhibit A; Supplemental Declaration of Christian Johansen ("Supp. Johansen Dec.") at ¶ 2, attached as Exhibit B.) But Sautin never met or communicated with Janis before September 20, 2003. (Supp. Sautin Dec. – Dismiss at ¶ 3, 12.) On that day Emile Gouiran, Helle Madsø, and three directors of NVID International, Inc. ("NVID"), Steven Gordon, Keith Duffy and Roy Janis, met in Paris, France at Falken's office. (<u>Id.</u> at ¶ 4.) NVID owned the residual patent rights to certain technology, including a patent for a silver dihydrogen citrate antimicrobial compound called Axenohl.[2] During that meeting, Gouiran and Madsø negotiated

---

    [1] It should first be pointed out that affiants Helle Madsø, Pascal Maillach, Roy Janis and Andrew Roberts are all employees, directors or shareholders of Falken and are controlled by Emile Gouiran.

    [2] Pure Bioscience recently was awarded $14.2 million in an arbitration against NVID International, Inc. for patent infringement of the Axenohl patent. Pure Bioscience is expecting a decision from the United States District Court for the Southern District of California compelling Falken to participate in an arbitration of the same issue. Obviously, this calls into question the purchase by Falken in September 2003 of the Axenohl technology from NVID. (See Press Release, Nov. 30, 2004, attached as Exhibit C.)

the purchase of NVID's Axenohl technology by Falken.  (Id. at ¶ 5.)  The NVID-Falken

transaction was publicly announced on September 23, 2003.  (See Press Release, Sept. 23, 2003,

attached as Exhibit D.)  Gordon, Duffy and Janis became members of Falken's Board of

Directors as a result of the transaction and that meeting.  (See Minutes of Organizational Meeting

of Shareholders and Directors of Falken, attached as Exhibit 1 to Supp Sautin Dec. – Dismiss.)

As a member of NVID's Board of Directors and an NVID shareholder, upon information and

belief, Janis received some part of the 460,000 preferred stock shares and 2,300,000 common

stock shares of Falken transferred in the deal.[3]  (See Press Release, Oct. 1, 2003, attached as

Exhibit E.)

Sautin never solicited or "induced" Janis to become an investor or director of Falken.  (Id.

at ¶ 7.)  Gouiran and Madsø were wholly responsible for negotiating the deal that made Janis a

director and shareholder of Falken.  (Id. at ¶ 8.)  The Organizational Meeting of Shareholders

and Directors of Falken on September 20, 2003, was the first time Sautin met or spoke to Janis.

(Id. at ¶¶ 3, 12.)  Sautin never made any representations to Janis regarding how long he or

Johansen intended to stay at Falken.  (Id. at ¶ 13.)  Instead, it appears Janis is relying on the

Shareholders Cross Protection Agreement for the "representation" that Sautin and Johansen

would stay at Falken until December 2005.  (See Shareholders Cross Protection Agreement at 1,

attached as Exhibit F.)  That Agreement, however, was entered into on October 6, 2003, *after*

Janis became a director and shareholder of Falken.  Sautin's only communications with Janis

were two or three e-mail communications after September 20, 2003 related to setting up a

meeting to discuss business.  (Supp. Sautin Dec. – Dismiss at ¶ 14.)

---

[3] Defendants do not know if Janis has made any other investment in Falken.

2.    Defendants Did Not Attempt To Establish A Supply Network Or Branch
Office In Massachusetts.

Plaintiffs allege that Falken's Board of Directors held a meeting on September 17, 2003 in which the Board decided that Sautin and Johansen would contact Massachusetts entities with the goal of establishing a Massachusetts supply network and regional office.  See Madsø Dec. at ¶¶ 30-35.  Plaintiffs allege that Sautin and Johansen were part of a committee formed at the September 17, 2003 meeting charged with the responsibility of locating office space in Boston, Massachusetts.  See Madsø Dec. at ¶ 36-38.  Plaintiffs allege that Sautin and Johansen were also charged with developing the United States and Massachusetts market by soliciting Massachusetts companies to sell Falken's products.  See Madsø Dec. at ¶¶ 39-41.

But none of these allegations are true.  There was no Board of Directors meeting on September 17, 2003.  (See Supp. Sautin Dec. – Dismiss at ¶ 15; Supp. Johansen Dec. at ¶ 13.)  Sautin and Johansen did not even become members of Falken's Board until September 20, 2003.  (Supp. Sautin Dec. – Dismiss at ¶ 16; Supp. Johansen Dec. at ¶ 14.)  After Gouiran and Madsø negotiated the NVID-Falken deal, Madsø asked Sautin and Johansen if they would become directors of Falken to act as a counterbalance to the "outside" directors Gordon, Duffy and Janis.  (Supp. Sautin Dec. – Dismiss at ¶ 9; Supp. Johansen Dec. at ¶ 9.)  Defendants were pressured to sign the Minutes of the Organizational Meeting of Shareholders and Directors even though they had not participated in the meeting.  (Supp. Sautin Dec. – Dismiss at ¶ 10; Supp. Johansen Dec. at ¶ 10.)

Despite Plaintiffs' numerous allegations that Falken's Board decided to expand into Massachusetts and delegated many of the necessary duties to Sautin and Johansen at the September 20, 2003 meeting, the Minutes are tellingly silent on the issue; in fact, Massachusetts is never even mentioned.  There is no mention of establishing a supply network or regional office

in Massachusetts. There is no mention of critical parts of Falken's purported Massachusetts

expansion being delegated to Sautin and Johansen. Why? It never happened.

Sautin and Johansen were never involved in discussions regarding establishing a supply

network and branch office in Massachusetts.[4] (Supp. Sautin Dec. – Dismiss at ¶ 18, 20; Supp.

Johansen Dec. at ¶ 16, 18; Declaration of Unni Fredheim ("Fredheim Dec.") at ¶ 12, attached as

Exhibit G.) Such tasks were never delegated to them. (Fredheim Dec. at ¶ 7.) Sautin and

Johansen certainly never took any action consistent with such a plan. (Supp. Sautin Dec. –

Dismiss at ¶ 19, 21; Supp. Johansen Dec. at ¶ 17, 19; Fredheim Dec. at ¶¶ 6-7.) They did not

contact any Massachusetts suppliers, real estate brokers, landlords, law firms, clients or gas

stations. (Supp. Sautin Dec. – Dismiss at ¶ 22; Supp. Johansen Dec. at ¶ 20; Fredheim Dec. at

¶¶ 10-11.) Sautin and Johansen worked exclusively with European suppliers and clients. (Supp.

Sautin Dec. – Dismiss at ¶ 23; Supp. Johansen Dec. at ¶ 21; Fredheim Dec. at ¶ 8.)

Plaintiffs have failed to credibly demonstrate that Sautin or Johansen ever transacted

business in Massachusetts. Moreover, the Massachusetts long-arm statute requires that Plaintiffs

show that their cause of action arose from Defendants' activity in Massachusetts. Plaintiffs have

made no such showing; all of the events related to Plaintiffs' Complaint occurred in France.

Thus, Plaintiffs cannot satisfy the requirements of personal jurisdiction under Massachusetts

state law.

---

[4] Defendants note that despite Falken's purported plan to expand into Massachusetts in September of 2003, to Defendants' knowledge, Falken still has no presence in Massachusetts today.

**B.     Exercising Jurisdiction Over Sautin And Johansen Would Violate Due Process.**

First, Plaintiffs allege there is *general* jurisdiction over Sautin and Johansen, demonstrating just how desperate Plaintiffs are.  There is no evidence suggesting that Sautin and Johansen have had such continuous and systematic contacts with Massachusetts that this Court would have general jurisdiction.  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408 (1984).  Indeed, multiple decisions from the First Circuit confirm that cannot be the case here.  See, e.g., United States v. Swiss Am. Bank, Ltd., 116 F. Supp. 2d 217, 224-25 (D. Mass.) (citing First Circuit cases holding no general jurisdiction).  Even accepting Plaintiffs' unsubstantiated allegations at face value, Sautin and Johansen had far fewer contacts with Massachusetts than defendants in Noonan v. The Winston Co., 135 F.3d 85 (1st Cir. 1998) (no general jurisdiction), Donatelli v. Nat'l Hockey League, 893 F.2d 459 (1st Cir. 1990) (no general jurisdiction), or Glater v. Eli Lilly & Co., 744 F.2d 213 (1st Cir. 1984) (no general jurisdiction). Defendants' Massachusetts contacts were, in fact, so scarce and so unrelated to Plaintiffs' claims that they do not even satisfy *specific* jurisdiction.  Plaintiffs also fail to demonstrate that the Court's exercise of specific jurisdiction here would satisfy Due Process.

1.     Plaintiffs' Claims Are Not Related To Defendants' Conduct In Massachusetts.

Importantly, Plaintiffs make no showing that their claims are related to Defendants' conduct in Massachusetts.  All of Plaintiffs' claims relate to Sautin and Johansen's employment at Falken in France.[5]  Thus, even taking Plaintiffs' self-serving and unsubstantiated allegations

---

[5] Moreover, to the extent Plaintiffs are attempting to assert jurisdiction based on Defendants' conduct undertaken at Falken's request or demand, the fiduciary shield doctrine applies.  The fiduciary shield doctrine is a judicially-created equitable principle that precludes a court from exercising personal jurisdiction over a non-resident corporate agent for acts performed on behalf of his employer.  See, e.g., Rice v. Nova Biomedical Corp., 38 F.3d 909,

regarding Defendants' Massachusetts-directed activities at face value, Plaintiffs have not

demonstrated that their claims are related to Defendants' in-forum contacts.

2.    Defendants Did Not Have Minimum Contacts With Massachusetts.

Plaintiffs have done nothing to demonstrate that specific jurisdiction exists and have only

further illuminated why the nexus of this case is in Paris, France. Defendants had no contacts

with Massachusetts other than the "random, isolated or fortuitous" contacts they related in their

initial brief and affidavits.[6]

---

(continued…)

912-14 (7th Cir. 1995), cert. denied, 514 U.S. 1111 (1995). The fiduciary shield doctrine "is
relevant to the court's consideration of propriety of exercising such jurisdiction." LaVallee v.
Parrot-Ice Drink Prods., Inc., 193 F. Supp. 2d 296, 302, n.2 (D. Mass. 2002). Here, Defendants
did not engage in the Massachusetts-directed acts as Plaintiffs allege. Nonetheless, the Court
should consider the fiduciary shield doctrine in finding any such acts were done on behalf of and
at the request of Falken, and thus do not confer personal jurisdiction over Defendants.

[6] Andrew Roberts, Manager of Information Technologies, joined Falken *after* Sautin and
Johansen left the company. He has stated in his affidavit that Sautin and Johansen's computer
hard drives were re-formatted or deleted, but that he was able to "resurrect" and recreate certain
correspondence logs. First, neither Sautin nor Johansen deleted, altered or destroyed their
computers or electronic data before they left. (See Supp. Sautin Dec. – Dismiss at ¶ 25; Supp.
Johansen Dec. at ¶ 23.) If anyone re-formatted the hard drives or deleted files, it was Falken.
Defendants have sent a spoliation letter to Plaintiffs' counsel requesting that Plaintiffs cease and
desist from deleting or modifying the electronic data on the computer hard drives or networks
formerly used by Sautin or Johansen. From Roberts' affidavit, it is apparent some spoliation has
already occurred. The Court should view Roberts' miraculous recovery of data with skepticism.
Neither Sautin nor Johansen contacted any of the entities on Roberts' "recreated" e-mail log.
(Supp. Sautin Dec. – Dismiss at ¶ 26; Supp. Johansen Dec. at ¶ 24.) Either someone else at
Falken contacted those entities after Sautin and Johansen left Falken, or the data is fabricated; a
forensic computer analyst should be able to confirm Defendants' suspicions. Interestingly,
Plaintiffs provide not one iota of evidence – other than their self-serving affidavits – that
substantiates their claims that Sautin and Johansen had numerous contacts with Massachusetts.
Plaintiffs have provided no e-mails between Defendants and Massachusetts entities, no copies of
correspondence, no phone records, and no affidavits from suppliers or landlords or real estate
brokers or attorneys or clients or gas stations in Massachusetts that they dealt with Sautin or
Johansen. All Plaintiffs provide is a manufactured list of e-mail addresses conveniently "re-
created" from re-formatted or deleted hard drives.

-7-

3.    The Exercise Of Personal Jurisdiction Over Defendants Would Not Be
Reasonable.

Plaintiffs' response makes it evident that the exercise of personal jurisdiction over
Defendants could not be reasonable.  Virtually all of the documents proof and witnesses, for both
sides, reside in France or Europe.  Like Defendants, Plaintiffs would face the enormous burden
of constantly shuttling documents and witnesses across the Atlantic Ocean.  Plaintiffs cannot
seriously argue that it is equally convenient for Johansen, Sautin and Falken to litigate this matter
in Massachusetts as in France.  Also, Massachusetts has no reason to be involved in a
commercial dispute between a corporation with its principal place of business in Paris and two
former employees who live in Europe.

Finally, paramount among the gestalt factors, is the duty of the Court to protect against
harassment.  It is axiomatic that a "plaintiff may not, by choice of an inconvenient forum, vex,
harass or oppress the defendant by inflicting upon him expense or trouble not necessary to his
own right to pursue his remedy."  Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947).  It has
come to Defendants' attention that Gouiran approached Unni Fredheim, a legal assistant hired by
Gouiran and Madsø in October 2003, and asked her if she knew of someone in the United States
willing to serve as a plaintiff in a lawsuit by Falken against Defendants.  Gouiran confirmed his
belief that Falken did not have colorable claims against Defendants but that he wanted to
institute suit to harass the Defendants, knowing it would be expensive and difficult for two
young Europeans to defend litigation in the United States.  The goal was to intimidate
Defendants into abandoning litigation they commenced in the Conseil de Prud'hommes in
France.  He also stated that while he preferred the straw man plaintiff (i.e., Janis) to be a Falken
shareholder, if they found a person willing to serve as a plaintiff who was not a shareholder,
Falken would give the person shares to create the impression the person had proper standing to

-8-

sue Defendants. (See generally Fredheim Dec. at ¶¶ 3-5.) This Court should reject Falken's attempt to harass Defendants by deliberately choosing this inconvenient forum.

## II.    MASSACHUSETTS IS AN INCONVENIENT FORUM FOR THIS LAWSUIT WHICH BELONGS IN FRANCE.

Plaintiffs fail to demonstrate – and in fact illuminate – why this case should be dismissed pursuant to the doctrine of forum non conveniens. It is undisputed France is an available forum. (Supp. Sautin Dec. – Dismiss at ¶ 24; Supp. Johansen Dec. at ¶ 22.) France is also an adequate forum. Plaintiffs try to argue that if forced to bring their case in France, where it belongs, they would be left with no remedy. In support, Plaintiffs submit three letters purported to be from French attorneys Sophie Trolle, Francis Kahan and Philippe Grundler. Those letters should be stricken and their contents disregarded, and Defendants so move. None of the letters are signed, notarized or otherwise indicate that they are true and correct testimony given under the penalty of the laws of the United States regarding perjury. See 28 U.S.C. § 1746 (governing unsworn declarations made outside the United States). Thus, lacking indicia of authenticity and the force of sworn testimony, they should be stricken. In addition, all three of Plaintiffs' letters simply state that the French labor court, the *Conseil de Prud'hommes*, does not have jurisdiction to hear Plaintiffs' claims. The letters are silent on whether another French court might have jurisdiction.

In contrast, Defendants have secured the Declaration of Ms. Laurence Defontaine, a French attorney with the Paris firm of Bignon, Lebray & Associés. She states that Plaintiffs' claims can be heard in an appropriate French Commercial Court. (See Declaration of Laurence Defontaine at 1-8, attached as Exhibit H.) Her opinion, unlike Plaintiffs' letters, has the force of sworn testimony and is supported by relevant citations to the French Civil Procedure Code, French Code of Administrative Justice and case law of the French Supreme Court.

Plaintiffs' response also conclusively establishes that under both the public and private interest criteria espoused in <u>Gulf Oil</u>, France is the more convenient forum. Plaintiffs do not dispute that the vast majority of the proof in this case – both testimonial and documentary – is located in France. Plaintiffs do not dispute that third-party witnesses are not subject to compulsory process, or that the cost of attendance of third-party witnesses at deposition or trial would be prohibitive. Plaintiffs attempt to argue that the translation of documents and testimony will not be a factor, claiming now that "the documents maintained at Falken are required to be in English," but this stands in stark contrast to Plaintiffs' Motion for Extension, where Plaintiffs represented to this Court that they needed an extension because "**<u>many</u>** documents have to be translated into several different languages given the nature of the parties which causes a further delay." <u>Compare</u> Pls.' Opp'n to Defs.' Mot. to Dismiss at 15, <u>with</u> Pls.' Mot. for Ext. at 1 (emphasis added).

With respect to the public interest criteria, Ms. Defontaine confirms that the time from filing to trial in a French Commercial Court would be approximately 15 to 18 months, significantly shorter than the 28.5 month average in this Court. (Defontaine Dec. at 8.) And while Plaintiffs argue that this is really an American dispute between an American company and two of its former employees, nothing could be further from the truth. Everything related to this case occurred in France. The only connection to Massachusetts is that it happens to be Janis's state of residence and it is inconvenient – by design – for Sautin and Johansen.

## III.    PLAINTIFFS' CASE MUST BE STAYED BECAUSE THE PARTIES AGREED TO ARBITRATE.

### A.    Equitable Estoppel Precludes Plaintiffs From Refusing To Arbitrate.

In the Complaint, Falken premises no less than eight claims on alleged breaches of the Shareholders Cross Protection Agreement ("Agreement"). <u>See</u> Complaint, Counts VIII-XI, XIV-

-10-

XVII.  Janis premises two claims on alleged breaches of the Agreement, claiming that

Defendants made representations they would remain at Falken through December 31, 2005.  See

Complaint, Counts XII-XIII.  Those representations are based on the Agreement.  See

Agreement, at 1 ("Whereas, each of the Shareholders, has . . . committed to remain in their

positions . . . until at least December 31, 2005.").  Plaintiffs argue in opposition to Defendants'

motion to compel arbitration that "neither Falken nor Janis signed the alleged agreement that

contains the arbitration clause."  Pls.' Opp'n to Defs.' Mot. to Dismiss, at 16.

      Plaintiffs cannot have it both ways, however.  Plaintiffs cannot claim entitlement to sue

under the Agreement, and then, when confronted by the Agreement's arbitration clause, claim

that it does not apply to them.  See, e.g., Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen

GMBH, 206 F.3d 411, 417-18 (4th Cir. 2000); Hughes Masonry Co., Inc. v. Greater Clark

County School Building Corp., 659 F.2d 836 (7th Cir. 1981).  The theory of equitable estoppel

prevents a nonsignatory from embracing a contract, and then turning its back on the portions of

the contract, such as an arbitration clause, that it finds distasteful.  E.I. DuPont De Nemours &

Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 200 (3d Cir. 2001).

Well-established common law principles dictate that in an appropriate case, a nonsignatory can

be bound by an arbitration agreement within a contract executed by other parties.  See, e.g.,

Thomason-CSF, S.A. v. Am. Arbitration Assoc., 64 F.3d 773, 776 (2d Cir. 1995).

      Here, the doctrine of equitable estoppel applies.  In the arbitration context, equitable

estoppel recognizes that a party may be estopped from asserting that the lack of his signature on

a written contract precludes enforcement of the contract's arbitration clause when he has

consistently maintained that other provisions of the same contract should be enforced to benefit

him.  Int'l Paper, 206 F.3d at 418.  "To allow [a plaintiff] to claim the benefit of the contract and

simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying the enactment of the Arbitration Act." Id. (quoting Avila Group, Inc. v. Norma J. of Cal., 426 F. Supp. 537, 542 (S.D.N.Y. 1977)).

For example, in Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411 (4th Cir. 2000), International Paper sued to enforce a contract between Wood Systems and Schwabedissen regarding the purchase of an industrial saw. International Paper was not a signatory. When Schwabedissen demanded arbitration under the contract, International Paper objected, arguing that it could not be compelled to arbitrate precisely because it was not a signatory. The court affirmed the decision of the district court which held that as a nonsignatory who derived a benefit from the contract and sought to enforce the terms of the contract in litigation, International Paper was equitably estopped from refusing to arbitrate.

The same result is warranted here. Falken and Janis derived a direct benefit from the Agreement because Sautin and Johansen provided services to Falken virtually for free. Falken has sued for damages based upon the Agreement and has requested a declaratory judgment requiring Defendants to return to work at Falken in conformance with the Agreement. Falken expressly claims in the Complaint that it is a third-party beneficiary of the Agreement.[7] "[A] third-party beneficiary of a contract containing an arbitration clause can be subject to that clause and compelled to arbitrate on the demand of a signatory." Intergen N.V. v. Grina, 344 F.3d 134, 146 (1st Cir. 2003). Janis, too, bases some of his claims on representations allegedly made in the Agreement. Plaintiffs cannot have it both ways.

---

[7] Defendants deny Falken that is a third-party beneficiary of the Agreement. For purposes of this motion, however, the Court should accept Falken's and Janis's statements in the Complaint as judicial admissions.

Plaintiffs baldly assert that their claims do not fall within the scope of the arbitration agreement, but the arbitration provision is a broad one encompassing "[a]ny disagreement arising out of this Agreement whether sounding in tort or contract." Plaintiffs have sued for enforcement of the Agreement in both contract and tort, and have asked for a declaratory judgment binding Defendants to the terms of the Agreement. Plaintiffs' claims are integrally related to the Agreement and Plaintiffs are bound to arbitrate.

**B.    To The Extent Plaintiffs Are Abandoning Their Claims Based On The Agreement, Those Claims Should be Dismissed.**

Helle Madsø's affidavit suggests that Falken is conceding its claims against Defendants related to the Agreement: "Falken does not necessarily take issue at this point with the Defendants leaving their positions prior to fulfilling their contractual commitment under the Shareholders Cross Protection Agreement." Madsø Aff. at ¶ 54. Madsø is President of Falken Industries, Ltd.; ostensibly, she has authority to bind the company. Thus, to the extent Plaintiffs are now abandoning claims related to the Agreement, Counts VIII-XVII of the Complaint should be dismissed.

## CONCLUSION

This case does not belong here for three independent reasons: (1) the Court lacks personal jurisdiction; (2) Massachusetts is an inconvenient forum; and (3) the parties are required to arbitrate. Defendants respectfully request that the Court enter an order granting Defendants' motion to dismiss, or in the alternative, enter an order staying the case and compelling the parties to arbitrate.

Dated: December ___, 2004

Respectfully submitted,

DEFENDANTS CHRISTIAN JOHANSEN
AND PATRICK SAUTIN

By their attorneys,


 /s/ Kurt B. Fliegauf
Thomas E. Peisch, Esq. (BBO #393260)
Kurt B. Fliegauf, Esq. (BBO #564329)
Amy C. Stewart, Esq. (BBO #655896)
CONN KAVANAUGH ROSENTHAL
    PEISCH & FORD, LLP
Ten Post Office Square
Boston, Massachusetts 02109
Telephone:  (617) 482-8200
Facsimile:  (617) 482-6444

OF COUNSEL:

John M. Majoras, Esq.
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

Dustin B. Rawlin, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114-1190
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

CLI-1259800v1

## **CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing on the following counsel of

record on this the 5th day of January, 2005, via U.S. Mail, postage pre-paid:

> Carlo Cellai, Esq.
> 76 Canal Street, Suite 402
> Boston, MA 02114
> Attorneys for Plaintiff

> /s/ Kurt B. Fliegauf
> Kurt B. Fliegauf
> Attorney for Defendants
> Christian Johansen & Patrick Sautin

217333.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

| | |
|---|---|
| FALKEN INDUSTRIES, LTD. AND ROY JANIS, | Civil Action No. 04-12479 MEL |
| Plaintiffs, | |
| v. | |
| CHRISTIAN JOHANSEN AND PATRICK SAUTIN, | |
| Defendants. | |

## SUPPLEMENTAL DECLARATION OF PATRICK SAUTIN IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

I, Patrick Sautin, do hereby declare as follows:

1.     I am over the age of twenty-one and I am competent to give the testimony contained in this declaration.

2.     Nickel Ltd.'s transfer of the Clean Plus product line to Falken took place on August 28, 2003.

3.     I never met or communicated with Roy Janis prior to September 20, 2003.

4.     On September 20, 2003, Emile Gouiran, Helle Madsø, and three directors of NVID International, Inc. ("NVID"), Steven Gordon, Keith Duffy and Roy Janis, met in Paris, France at Falken's office.

5.     During that meeting, Gouiran and Madsø negotiated the purchase of NVID's Axenohl technology by Falken.

6.     I did not attend the meeting, although I was in the office working that day.

7.     I never solicited or "induced" Janis to become an investor or director of Falken.

CLI-1261402v1

8.      Gouiran and Madsø were wholly responsible for negotiating the deal that made Janis a director and shareholder of Falken.

9.      After Gouiran and Madsø negotiated the NVID-Falken deal, Madsø asked me if I would become a director of Falken to act as a counterbalance to the "outside" directors Gordon, Duffy and Janis.

10.     I was pressured by Gouiran and Madsø to sign the Minutes of the Organizational Meeting of Shareholders and Directors even though I had not participated in the meeting.

11.     Gouiran and Madsø were exclusively responsible for soliciting investors, including Janis.

12.     The first time I met or spoke to Janis was after the Organizational Meeting of Shareholders and Directors of Falken on September 20, 2003.

13.     I never made any representations to Janis regarding how long I or Johansen intended to stay at Falken.

14.     I may have had two or three e-mail communications with Roy Janis after September 20, 2003, but I do not know if Janis was in Massachusetts at the time. The e-mails were not related in any way to the allegations made by Janis in the Complaint.

15.     There was no Falken Board of Directors meeting held on September 17, 2003.

16.     I was not a member of Falken's Board of Directors as of September 17, 2003.

17.     I have no knowledge of a plan for Falken to strategically expand into Massachusetts.

18.     I was never involved in any discussions whereby I agreed or was instructed to establish a Massachusetts supply network.

19.     I never undertook any action to establish a supply network in Massachusetts.

CLI-1261402v1

20.    I was never involved in any discussions whereby I agreed or was instructed to establish a regional office in Massachusetts.

21.    I never undertook any activity to establish a regional office in Massachusetts.

22.    I never contacted any Massachusetts suppliers, real estate brokers, landlords, law firms, clients, or gas stations.

23.    I worked exclusively with European suppliers and clients.

24.    I am amenable to service in France.

25.    I did not delete, alter, or destroy my computer or electronic data prior to leaving Falken.

26.    I did not contact any of the entities listed in Mr. Roberts' Affidavit.

27.    Attached to this Supplemental Declaration as Exhibit 1 is a true and correct copy of the Minutes of the Organizational Meeting of Shareholders and Directors of Falken Industries Ltd. dated September 20, 2003.


Under the laws of perjury of the United States of America, I do hereby declare that the foregoing is true and correct.



Dated this 5th day of January, 2005.

Patrick Sautin

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

| | |
|---|---|
| FALKEN INDUSTRIES, LTD. AND ROY JANIS, | Civil Action No. 04-12479 MEL |
| Plaintiffs, | |
| v. | |
| CHRISTIAN JOHANSEN AND PATRICK SAUTIN, | |
| Defendants. | |

## SUPPLEMENTAL DECLARATION OF CHRISTIAN JOHANSEN IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

I, Christian Johansen, do hereby declare as follows:

1.    I am over the age of twenty-one and I am competent to give the testimony contained in this declaration.

2.    Nickel Ltd.'s transfer of the Clean Plus product line to Falken took place on August 28, 2003.

3.    I never met or communicated with Roy Janis prior to September 20, 2003.

4.    On September 20, 2003, Emile Gouiran, Helle Madsø, and three directors of NVID International, Inc. ("NVID"), Steven Gordon, Keith Duffy and Roy Janis, met in Paris, France at Falken's office.

5.    During that meeting, Gouiran and Madsø negotiated the purchase of NVID's Axenohl technology by Falken.

6.    I did not attend the meeting, although I was in the office working that day.

7.    I never solicited or "induced" Janis to become an investor or director of Falken.

8.    Gouiran and Madsø were wholly responsible for negotiating the deal that made Janis a director and shareholder of Falken.

9.    After Gouiran and Madsø negotiated the NVID-Falken deal, Madsø asked me if I would become a director of Falken to act as a counterbalance to the "outside" directors Gordon, Duffy and Janis.

10.    I was pressured by Gouiran and Madsø to sign the Minutes of the Organizational Meeting of Shareholders and Directors even though I had not participated in the meeting.

11.    Gouiran and Madsø were exclusively responsible for soliciting investors, including Janis.

12.    The first time I met or spoke to Janis was after the Organizational Meeting of Shareholders and Directors of Falken on September 20, 2003.

13.    There was no Falken Board of Directors meeting held on September 17, 2003.

14.    I was not a member of Falken's Board of Directors as of September 17, 2003.

15.    I have no knowledge of a plan for Falken to strategically expand into Massachusetts.

16.    I was never involved in any discussions whereby I agreed or was instructed to establish a Massachusetts supply network.

17.    I never undertook any action to establish a supply network in Massachusetts.

18.    I was never involved in any discussions whereby I agreed or was instructed to establish a regional office in Massachusetts.

19.    I never undertook any activity to establish a regional office in Massachusetts.

20.    I never contacted any Massachusetts suppliers, real estate brokers, landlords, law firms, clients, or gas stations.

21.    I worked exclusively with European suppliers and clients.

22.    I am amenable to service in France.

23.    I did not delete, alter, or destroy my computer or electronic data prior to leaving

Falken.

24.    I did not contact any of the entities listed in Mr. Roberts' Affidavit.

25.    Attached to this Supplemental Declaration as Exhibit 1 is a true and correct copy

of the Minutes of the Organizational Meeting of Shareholders and Directors of Falken Industries

Ltd. dated September 20, 2003.


Under the laws of perjury of the United States of America, I do hereby declare that the

foregoing is true and correct.


Dated this 5 day of January, 2005.

Christian Johansen

CLI-1261561v1

# MINUTES OF
## THE ORGANIZATION MEETING OF SHAREHOLDERS AND DIRECTORS
### OF
## FALKEN INDUSTRIES LTD

The ORGANIZATION MEETING of the directors and shareholders of the corporation was held at its offices, on the 27th day of September, 2003 at 10:00 A.M..

The following person was present

Pius HUBER
Helle A. MADSØ
Christopher BELL
Steven GORDON
Manuel GARCIA-FAURE

being all of the directors of the corporation and a quorum.
The director called the meeting to order.

Steven GORDON, was duly elected chairman and Secretary of the meeting.
The secretary presented to the meeting a copy of the certificate of incorporation and reported that it was filed in the office of the secretary of State, Trenton, New-Jersey on August 6, 2003. The copy of the certificate of incorporation together with the receipt of the Secretary of State showing payment of the fees and taxes were ordered appended to these minutes.

The following resolutions were adopted :

**RESOLVED**, that the following persons were elected officers of the corporation to serve for one year or until their successors are elected and qualified. The annual salary of each officer, if any, was fixed at the amount appearing after the officer's name.

President, Steven GORDON (A drawing account not exceeding $ 3,500 per month is authorized against remuneration not to exceed the lower of $ 140,000.00 or 1% of net sales, adjusted annually, for so long as such payment, after accounting for all

payments set forth below, does not result in an operating loss for the corporation in which event such reduced amount as appropriate to prevent such loss. If such payments exceed $ 70,000 per year, such surplus payment(s) to be made in cash or stock valued at market at the sole option of the corporation.)

Executive Vice President, Strategic Planning & Marketing Helle A. MADSØ (A drawing account not exceeding $ 3,500 per month is authorized against remuneration not to exceed the lower of $ 140,000.00 or 1% of net sales, adjusted annually, for so long as such payment, after accounting for all payments set forth below, does not result in an operating loss for the corporation in which event, such reduced amount as appropriate to prevent such loss. If such payments exceed $ 70,000 per year, such surplus payment(s) to be made in cash or stock valued at market at the sole option of the corporation.)

Secretary and treasurer, Emmanuel (Manuel) M. GARCIA-FAURE,(A drawing account not exceeding $ 3,500 per month is authorized against remuneration not to exceed the lower of $ 140,000.00 or 1% of net sales, adjusted annually, for so long as such payment, after accounting for all payments set forth below, does not result in an operating loss for the corporation in which event, such reduced amount as appropriate to prevent such loss. If such payments exceed $ 70,000 per year, such surplus payment(s) to be made in cash or stock valued at market at the sole option of the corporation.)

First Assistant Vice-President, Purchasing and Manufacturing Production, Christian JOHANSEN (A drawing account not exceeding $ 2,800 per month is authorized against remuneration not to exceed 2,5% of gross operating profits on sales, adjust'ed annually, for so long as such payment, after accounting for all payments set forth below, does not result in an operating loss for the corporation, in which event such reduced amount as appropriate to prevent such loss.)

First Assistant Vice-President, Sales, Patrick SAUTIN (A drawing account not exceeding $ 2,800 per month is authorized against remuneration not to exceed 2,5% of gross operating profits on sales, adjusted annually for so long as such payment, after accounting for all payments set forth below, does not result in an operating loss for the corporation, in which event, such reduced amount as appropriate to prevent such loss.)

Assistant Vice-President, Sales, Morten MADSØ (A drawing account not exceeding $ 2,500 per month is authorized against remuneration not to exceed the lesser of $ 30,000.00 or 5,5% of net operating profits on sales, adjusted annually, for so long as such payment, after accounting for all payments set forth below, does not result in an operating loss for the corporation, in which event, such lesser amount as appropriate to prevent such loss.)

Assistant Vice-President, logistics and quality control, Niel STIVEY (A drawing account not exceeding $ 2,500 per month is authorized against remuneration not to exceed the lesser of $ 30,000.00 or 5.5% of net operating profits on sales, for so long

as such payment does not result in an operating loss for the corporation, in which event, such lesser amount as appropriate to prevent such loss.)

Assistant Vice President Finance, Nathalia STOEVA (A drawing account not exceeding $ 2,500 per month is authorized against remuneration not to exceed the lesser of $ 30,000.00 or 5.5% of net operating profits on sales, for so long as such payment does not result in an operating loss for the corporation, in which event, such lesser amount as appropriate to prevent such loss.)

Each of the foregoing individuals, will execute an accord with the corporation to remain in its employ a minimum of two years.

For these purposes, " Net Sales" shall include all revenue, after deduction of value added or other taxes, transport and special handling charges on the sale of Clean Plus® product group items. "Gross Operating Profit" shall include "Net Sales" after deduction of all manufacturing, transport, development and all expenses related to the manufacture and delivery of a final product - exclusing General, Sales and Administrative expenses, "Net Operating Profits" shall include Gross Operating Profit, less General, Sales and Administrative Expenses.

The remunerations of the President, Executive Vice President, and Corporate Secretary and Treasurer shall take effect on the first of the month following the successful completion of an authorized private placement intended to raise a minimum of $ 450,000.00 to a maximum of $ 1,125,000.00 through the sale of 750.000 shares of FALKEN Common Class A stock.

The amount, computations and reports of all annual remuneration paid beyond the stated drawing accounts, shall be memorialized by board ratification, and in a record of the proceeding by minutes of the corporation not later than February 15 for the prior year, with payment effected no later than the following April 15.

**RESOLVED**, that the seal, an impression of which appears in the margin hereof, was adopted as the seal of the corporation.

**RESOLVED**, that the president is authorized to issue certificates for shares in the form appended hereto.

**RESOLVED**, that the president and any other convenient officer is requested to open a bank account on behalf of the corporation with any U.S. Banking

institution, and a multi-currency, account in an institution located in Europe.

RESOLVED, that the by-laws regulating the conduct of the business and affairs of the corporation were adopted and appended hereto.

RESOLVED, that the officers of the corporation are authorized to engage in any business or activity authorized for corporations by the State of New-Jersey or any relevant law.

RESOLVED, that the proper officers of the corporation are authorized to sell and issue common and prefered shares consistent with the objectives of the corporation, and

RESOLVED, that the officers of the corporation are directed to maintain such accounting records as are necessary so that any shareholder that experiences a loss on the transfer of common shares of the corporation may determine whether they qualify for "ordinary loss" deduction treatment on their personal income tax returns.

RESOLVED, that the president and secretary are authorized to issue the shares of the corporation as hereinafter set forth :

| Shareholder | Number of Shares | Value accorded Consideration |
|---|---|---|
| Pius HUBER, | 5.223.767 | $ 7.835.650,00 |
| Helle A. MADSØ | 954.483 | $ 1.430.770,00 |
| Patrick SAUTIN | 122.300 | $    183.449,98 |
| Morten MADSØ | 92.300 | $    138.357,77 |
| Christian JOHANSEN | 98.750 | $    148.026,25 |
| Niel STIVEY | 71.380 | $    106.998,62 |

The president was directed to annex hereto a statement of the consideration received from those shareholders who paid, in whole or in part, real property, tangible or intangible personal property, labor or services performed for the corporation or in its formation, for their shares.

RESOLVED, that the consideration received by the corporation upon the issuance and sale of shares without par value shall be allocated on the books of the corporation as follows : $ 2.500.00 of the consideration received for each such share shall

be allocated to stated capital, and the remainder of the consideration received for each such share shall be allocated to capital surplus.

RESOLVED, that the proper officers of the corporation are hereby authorized to make and file such certificates, reports and other documents as may be required by law to be filed in any state in which said officers shall find it in the best interests of the corporation to file the same, to authorize the corporation to transact business in such state.

RESOLVED, that the president and the treasurer are authorized to pay all expenses incurred in connection with the organization of the corporation and the treasurer is authorized to elect on the first federal tax return, to deduct the foregoing expenses rateably commencing with the first month of business and extending for a period of sixty months pursuant to Section 248 of the Internal Revenue Code of 1954, as amended.

RESOLVED, that the proper officers of the corporation are authorized to do all necessary acts and execute such documents as are necessary to obtain the exclusive legal right to such the business operated by the Clean Plus® product group owned by NICKEL LTD, acquire all trade names, trade marks, service marks, designs, patents, etc. related thereto, all as more particularly outlined in a certain Asset Purchase Agreement.

RESOLVED, that the president or his designate is authorized to negotiate an agreement for the acquisition of any and all rights owned by N.V.I.D. International Inc. In a certain patent known as Axenohl, all as more particularly described in a certain document entitled Omnibus Assignment, on such terms and conditions as he deems to be in the best interest of the corporation and the proper officers of the corporation are authorized to execute all documents necessary to effectuate said agreement.

RESOLVED, that the corporation proceed to carry on the business for which it was incorporated.


BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK

The signing of this consent by the undersigned(s) shall constitute full ratification of the action taken to organize the corporation as set forth in the foregoing resolutions.

Consent dated September 19, 2003

_____    _____
                                    Chairman

_____    _____
            Director                     Director

_____    _____
            Director                     Director

_____    _____
            Director                     Director

The Chairman then reported that the shares of the corporation had been issued pursuant to the foregoing resolutions and that the shareholders would be invited to join the meeting.

The following shareholder was present :

Pius HUBER
Helle A. MADSØ
Morten MADSØ
Christian JOHANSEN
Patrick SAUTIN
Neil STIVEY

being all of the shareholders of the corporation and a quorum.

The Chairman then stated that the meeting would continue as a combined meeting of the shareholders and directors of the corporation.

The following resolutions were adopted :

**RESOLVED**, that the following persons were elected directors of the

corporation to serve commencing as of the close of this meeting for one year or until their successors are elected and qualified :

       Steven GORDON
       Helle A. MADSØ
       Keith DUFFY
       Roy JANIS
       Manuel M. GARCIA-FAURE
       Christian JOHANSEN
       Patrick SAUTIN

**RESOLVED**, that the signing of these minutes shall constitute an acknowledgement of the contents thereof, ratification thereof, and waiver of notice of the meeting by the signatories.

There being no further business before the meeting, it was, adjourned.

_____    _____
Secretary of the meeting             Director
& Director

_____
Chairman of the meeting
& Director

_____
Director

_____
Director

_____
Director

_____
Director

# MINUTES OF SPECIAL MEETING OF DIRECTORS
## OF
# FALKEN INDUSTRIES LTD

A SPECIAL MEETING of the Board of Directors of the Corporation was held on September 29, 2003 at 10:00 A.M.,at its offices.

All of the Directors being present, the meeting was called to order by the Chairman. The Chairman advised that the meeting was called to approve a resolution to permit the opening of a multi-currency bank account in Europe, and in particular in the Republic of France.

And upon motion duly made, seconded and unanimously carried, it was:

**RESOLVED**, that the resolution presented to the meeting is hereby approved and adopted, and that the corporation is hereby authorized to take whatever action is necessary to implement the resolution and it is further,

**RESOLVED**, that the signing of these minutes by the Directors shall constitute full ratification thereof and waiver of notice of the meeting by the signatories.

There being no further business to come before the meeting, upon motion duly made, seconded and unanimously carried, the meeting was adjourned.

_____
Secretary

_____
Chairman

_____
Director

_____
Director

_____
Director

_____
Director

_____
Director

_____
Director

**looksmart**    **findarticles**
http://www.looksmart.com/    http://www.findarticles.com/

FindArticles > Business Wire > Nov 30, 2004 > Article > Print friendly

## PURE Bioscience Wins $14.2 Million Arbitration Award; Patent Ownership Confirmed; Royalty Obligation Terminated

SAN DIEGO -- PURE Bioscience (OTCBB:PURE) today announced it received a $14.2 million award resulting from its arbitration proceeding against NVID International, Inc. through the American Arbitration Association International Center for Dispute Resolution.

The award is the result of PURE's October 2003 arbitration action against NVID International and Falken Industries, Ltd. PURE sought damages and relief from continued and ongoing public dissemination of false, misleading and disparaging statements as well as complete cooperation in enforcing and defending the Axenohl patent and related technology. The arbitration was bifurcated and PURE proceeded first against NVID. The arbitration against Falken Industries is pending, and a decision from the United States District Court on PURE's motion to compel Falken's participation in the arbitration is expected shortly.

Michael L. Krall, PURE Bioscience's President and CEO, said, "NVID's false claims regarding our patent ownership and royalties due had cast a shadow on our business activity by calling into question our ownership of and right to market our silver dihydrogen citrate technologies. We expect the sales cycle for our silver dihydrogen citrate based products will accelerate now that we can clearly and definitively assert our ownership of the patent to current and potential customers without dispute."

Dennis B. Atchley, PURE Bioscience's Secretary and Corporate Counsel, stated, "The Arbitrator's well-reasoned decision is expected to be confirmed as a judgment in court. The significance of this award is three-fold: first, it confirms PURE's exclusive ownership of the Axenohl patent and related technologies; second, due to the Arbitrator's determination of material breach by NVID International, PURE's royalty and other contractual obligations to NVID are legally terminated; and third, it empowers PURE to go forward free of what the Arbitrator aptly termed, NVID's conduct meant to 'frustrate PURE's ability to exploit the Axenohl patent.'"

PURE's management, with its legal team, is evaluating the issue of collectibility and potential liability of related individuals and entities.

Technology Worth Defending

PURE Bioscience's flagship technology is a patented, aqueous antimicrobial called silver dihydrogen citrate (SDC). SDC is an electrolytically generated source of stabilized ionic silver that can serve as the basis for a broad range of products in diverse markets. Colorless, odorless, tasteless and non-caustic, SDC formulates well with other compounds. PURE produces and markets pre-formulated, ready-to-use product, as well as varying strengths of silver dihydrogen citrate concentrate as an additive or raw material for inclusion in other companies' products.

PURE currently has Environmental Protection Agency (EPA) registration for its 2400-parts per million (ppm) technical grade SDC concentrate (trade name Axenohl(R)) as well as for its Axen(R) and Axen(R)30 hard surface disinfectant products for commercial, industrial and consumer applications including restaurants, homes and medical facilities. The Axen30 EPA registration includes a 30 second kill time on standard indicator bacteria, a 24 hour residual kill on standard indicator bacteria, a 2 minute kill time on some resistant strains of bacteria, 10 minute kill

time on fungi, 30 second kill time on HIV Type I, and 10 minute kill time on other viruses. These claims distinguish the efficacy of Axen30 from many of the leading commercial and consumer products currently on the market, while maintaining lower toxicity ratings. Based on the EPA toxicity categorization of antimicrobial products that ranges from Category I (high toxicity) down to Category IV, Axen30 is an EPA Category IV antimicrobial for which precautionary labeling statements are normally not required. This compares with Category II warning statements for most leading brands of disinfectant products.

PURE's technology also shows promise as a broad-spectrum antimicrobial for use in human and veterinary healthcare products. PURE has chosen to pursue approvals through the U.S. Food and Drug Administration (FDA) by partnering with Therapeutics, Incorporated, which has assumed responsibility for funding and managing the testing and regulatory process for potential FDA regulated silver dihydrogen citrate-based products. Therapeutics, Incorporated is focusing on development of silver dihydrogen citrate-based products for the treatment of bacterial, viral and fungal mediated diseases and conditions, beginning with women's health products and acne treatment products. Therapeutics, Incorporated expects its development work will result in multiple Investigational New Drug (IND) filings with the US FDA.

About PURE Bioscience

PURE Bioscience (PURE) develops and markets technology-based products in the bioscience and water treatment sectors to provide non-toxic solutions to global health challenges. PURE's proprietary high efficacy/low toxicity bioscience technologies, including its silver dihydrogen citrate antimicrobials and Triglycylboride(TM) pesticides, represent innovative advances in diverse markets. PURE is currently America's leader in pharmaceutical water purification with its Fillmaster(R) equipment, and the Company has expanded into residential water treatment with its Nutripure(R) water filtration systems. PURE Bioscience is headquartered in El Cajon, California (San Diego metropolitan area) and its common stock is listed on the OTC Bulletin Board under the symbol "PURE." Incorporated in 1992, PURE Bioscience was formerly named Innovative Medical Services.

This press release includes statements that may constitute "forward-looking" statements, usually containing the words "believe", "estimate", "project", "expect" or similar expressions. These statements are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Forward-looking statements inherently involve risks and uncertainties that could cause actual results to differ materially from the forward-looking statements. Factors that would cause or contribute to such differences include, but are not limited to, acceptance of the Company's current and future products and services in the marketplace, the ability of the Company to develop effective new products and receive regulatory approvals of such products, competitive factors, dependence upon third-party vendors, and other risks detailed in the Company's periodic report filings with the Securities and Exchange Commission. By making these forward-looking statements, the Company undertakes no obligation to update these statements for revisions or changes after the date of this release.

For additional information on PURE Bioscience contact Donna Singer, Executive Vice President, at (619) 596-8600 or via email at dsinger@imspure.com

On the Web: www.pure-bioscience.com

COPYRIGHT 2004 Business Wire
COPYRIGHT 2004 Gale Group

Case 1:04-cv-12473-MEL   Document 15-6   Filed 01/05/2005   Page 1 of 1

**looksmart**     **findarticles**
http://www.looksmart.com/     http://www.findarticles.com/

FindArticles > Business Wire > Sept 23, 2003 > Article > Print friendly

## CORRECTING and REPLACING NVID International Inc. Residual Rights to Axenohl Patent Acquired by Falken Industries Ltd

Business Editors

CORRECTION...by NVID International Inc.

WEST PALM BEACH, Fla.--(BUSINESS WIRE)--Sept. 23, 2003

In BW5577 issued Sept. 23, 2003: Contact phone number should read xxx 561-307-0571 (sted 560-307-0571).

NVID International Inc. announced today that it has sold and assigned all of its interest in the Axenohl technology and patent (Axen) on September 19, 2003 to Falken Industries Ltd (Falken), a privately held company based in Paris, France.

NVID received 460,000 shares of Falken common stock, and warrants to acquire 460,000 shares of 4.5% coupon Preferred stock at $1.00 per share and 2,300,000 shares of Falken common at $1.50 per share.

Falken is a leading developer and manufacturer of industrial and consumer wipes and chemical products primarily for the automobile after-market. Falken, who recently acquired the Clean Plus product group (http://www.cleanplus.com), is now the leading manufacturer of high quality and innovative wet wipe specialty cleaning products in Europe.

COPYRIGHT 2003 Business Wire
COPYRIGHT 2003 Gale Group

**looksmart**
http://www.looksmart.com/

**findarticles**
http://www.findarticles.com/

FindArticles > Business Wire > Oct 1, 2003 > Article > Print friendly

## NVID International Inc. to Distribute Falken Industries Ltd. Stock and Warrants to Shareholders

Business Editors

WEST PALM BEACH, Fla.--(BUSINESS WIRE)--Oct. 1, 2003

NVID International Inc. (OTC:NVID) announced today that it will distribute to shareholders all Falken Industries Ltd. (Falken) common stock and warrants acquired from the sale and assignment of all its interests in the Axenohl technology and patent (Axen) to Falken, a privately held company based in Paris, France.

The ratio of distribution is .005 common shares and warrants of Falken for every share of NVID owned. Payment date is October 13, 2003 to shareholders of record October 10, 2003.

COPYRIGHT 2003 Business Wire
COPYRIGHT 2003 Gale Group

# SHAREHOLDERS
# CROSS PROTECTION AGREEMENT

BY AND BETWEEN :

Helle A. MADSØ ("MADSO"), Patrick SAUTIN ("SAUTIN"), Christian JOHANSEN ("JOHANSEN") and Niel STIVEY ("STIVEY"), herein after also collectively known as "Shareholders" ;

### P R E A M B U L E

WHEREAS, Shareholders as a whole, form the initial core group of an entrepreneurial project (NICKEL LTD), whose purpose and objective was the conception, design, production and commercialization of products under the Clean Plus® general label - see www.cleanplus.com ;

WHEREAS, NICKEL LTD has sold to FALKEN INDUSTRIES LTD ("FALKEN") all of its interest in the Clean Plus® product group in an Asset Sale transaction realized and closed in the United States of America, on August 28, 2003 ;

WHEREAS, Shareholders, as a result of such endeavor and their unconditional and present general release of all and any present and / or future claims they had, have or might have had against NICKEL LTD, have or will be receiving a substantial quantity of shares in FALKEN ;

WHEREAS, each of Shareholders, has, intending to be contractually bound thereby, committed to remain in their positions, but with FALKEN and the Clean Plus® product group, until at least December 31, 2005 ;

WHEREAS, Shareholders' agreement to remain until December 31, 2005 was and remains a material condition to the award of shares received by each of the Shareholders ;

WHEREAS FLAKEN will continue to exploit and operate the Clean Plus® product group as an integrated business both in the United States and in Europe ;

WHEREAS, FALKEN acquired for stock and warrants, from NVID International Inc OTC:NVID all of its rights and title in a certain Axenohl patent, and as a result of such transaction, will, or is expected to have, on or before October 31, 2003 nearly 2000 shareholders ;

WHEREAS, as a result of the foregoing, FALKEN shall, as a matter of law be considered a "Public Corporation" and be required to file and operate in accordance therewith ;

WHEREAS, as a result of the foregoing, FALKEN will, upon the successful completion of a Private Placement and such exercise of warrants by NVID shareholders as is anticipated under the transaction realized, proceed to register a public offering for 1 million shares of its common stock ;

WHEREAS, the offering price of such shares is expected to be $ 2,00 per share or thereabouts ;

WHEREAS, as a result of such offering, the shares of FALKEN are expected to be freely traded on the NASDAQ ;

WHEREAS, Shareholders independently and collectively represent a substantial block of shares, and such shares are not and it is not intended that they shall otherwise be restricted ;

WHEREAS, Shareholders believe that it is in their respective and collective interest to restrict their sale of FALKEN shares ;

WHEREAS, such restrictions are intended as and between each other and shall have the force of contract, each of the Shareholders intending to be formally bound thereby ;

IT IS CONSEQUENTLY AGREED AS FOLLOW :

# WITNESSETH

Each of the Shareholders agree that for the period commencing on the first day that FALKEN shares are publicly traded, and for the period time as indicated below for each of them, each ;

1. shall not offer for sale, exchange, barter, transfer, gift, assign or otherwise alienate an interest, directly or indirectly, as to any shares owned by each of them of record as at any date, however such interest may be acquired, on or prior to December 31, 2004 :

a. if the aggregate of all shares sold or offered for sale by all Shareholders in the 30 days just preceding shall exceed 5% of the weighed average number of shares traded in the open public market in the 30 days just preceding ;

b. if at the time such sale would be contemplated the number of FALKEN shares offered by any of the Shareholders is 25% or more greater than the number of shares bid for ;

c. if the number of shares contemplated for sale by any such member of the Shareholders is greater than 15% of the number of shares offered for sale in the public market ;

For purposes of the above the statistics available from any market maker in FALKEN shares, or as published by any recognized stock market news Internet facility shall be conclusive.

The restrictions set forth above shall ;

a. terminate as to any of the Shareholders who is still employed or involved in a consulting, directorship or similar capacity with FALKEN on December 31, 2006 ;

b. terminate on December 31, 2009 as to any of the Shareholders who is no longer employed or involved in a consulting, directorship or similar capacity with FALKEN as at any time prior to December 31, 2006.

It is agreed that a violation of the foregoing restrictions by any of the Shareholders, can have serious, long-term and far reaching economic consequences which could be difficult to quantify. Consequently, Shareholders bind themselves, their heirs, executors, administrators and assigns, in the sum of the greater of 100% of the sales proceeds realized from the sale of shares or $ 3,50 per share sold, to be paid to *each* of the other members of Shareholders by such of Shareholders failing to keep, observe and perform the covenants and agreements herein, such amount hereby agreed upon as settled and liquidated damages for such nonperformance.

In the event of any allegation of nonperformance, the sole burden of proof required in any adjudication shall be that of the defending party showing compliance. The prevailing party in any judicial or arbitration conflict shall be entitled to recovery of their court or arbitration costs, including the reasonable fees of counsel, both at the trial and appellate levels.

## GENERAL PROVISIONS

**Section 1.1:** Every notice required or contemplated by this Agreement, by any party, may be delivered in person or given by postage prepaid registered mail return receipt requested (or it's equivalent under the laws of the country where mailed), which shall be registered air mail if posted in a country other than that of the addressee, addressed to the party for whom intended, at the address specified at the beginning of this Agreement for each and every party, or at such other address as the intended recipient previously shall have designated by written notice to the other party(ies). Unless otherwise provided in this Agreement, notice by registered mail return receipt requested, shall be effective on the date it is officially recorded as delivered by return receipt or equivalent, and in the absence of such record of delivery, it shall be presumed to have been delivered on the thirtieth (30th) day, or the next day thereafter, after it was deposited in the mail. Notice not given in writing shall be effective only if acknowledged in writing by the party to whom it was given.

**Section 1.2:** The failure of any party hereto, at anytime, to require performance by the other(s) of any provision of this Agreement shall in no way affect the right of such party to require performance of that or any provision, and any waiver by any party of any breach of any provision of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, a waiver of the provision itself, or a waiver of any right under this Agreement.

**Section 1.3:** This document sets forth the entire Agreement and understanding between the parties relating to the subject matter(s) contained therein and merges and supersedes all prior discussions and documents relating thereto, and no Party shall be bound by any definition, condition, representation, warranty, promise or provision other than as expressly set forth in this Agreement, or as is contemporaneously or subsequently set forth in writing and executed by the party(ies) to be bound thereby. The failure or refusal of any party to inspect the Agreement or other documents, or the failure to obtain legal or other advise relevant to this transaction, constitutes an irrevocable waiver of any objection, contention or claim that might have been based on such reading, inspection or advise. No modification or amendment of this Agreement shall be of any force or effect unless in writing and executed by all of the Parties to be charged thereunder.

**Section 1.4:** The validity, construction and enforceability of this Agreement shall be governed in all respects by application of the substantive law of contracts as practiced in the State of New Jersey, United States of America, but the choice of law or procedural provisions of any such law shall not be applicable.

**Section 1.5:** All of the Parties agree, that the official and only binding and effective text of this Agreement exist only in the English language as construed under an American literary use and in its technical terminology. Both of the Parties acknowledge all necessary access to solicit and obtain whatever professional assistance, necessary for their proper and competent evaluation and understanding of the consequences to arise out of the obligations and promises consented under this Agreement. Any translated version of this Agreement is to be deemed and considered only for informational purposes, and no Party shall be entitled to rely upon the text of a translated version when asserting any right, when attempting to enforce the performance of any obligation, or for any other purpose at all.

**Section 1.6:** Descriptive headings, the index and the table of contents if any, wherever located or at any time generated are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

**Section 1.7:** In case one or more provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or un-enforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such

invalid, illegal or unenforceable provision had never been contained herein.

**Section 1.8:** All of the Parties represent that the signatures set forth herein are that of the proper individuals, or in the case of corporations or other entities, that of the proper officers, partners, or Parties authorized in every respect to bind the Party or executing entity.

**Section 1.9:** No action, regardless of form, arising out of this Agreement, may be brought by any party hereto, more than two (2) years after the cause of action has arisen.

**Section 1.10:** This Agreement shall be binding upon and inure to the benefit of the Parties hereto, their successors and assigns.

**Section 1.11:** This Agreement may be executed in any number of counterparts or may be, where the same are not required, certified or otherwise delivered without the testimonium clause and signatures; each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

**Section 1.12:** Any disagreement arising out of this Agreement whether sounding in tort or in contract, shall be submitted to binding arbitration conducted in the English language to be held in Geneva, Switzerland, under the International Arbitration Rules (effective November 1, 2001) of the American Arbitration Association [www.adr.org]. Judgment upon the award may be entered in any court having jurisdiction under this Agreement with no appeal therefrom.

The arbitrators shall have no power to change any of the provisions of this Agreement in any respect, nor, shall they have the power to make an award of reformation, or, to formulate any relief for any Party on the basis of any finding of adhesion, duress, undue influence, or other similar suggestion that any one of the Parties had executed this Agreement in any state of mind other than one willing, able, knowing, informed and desirous of entering into this Agreement, and the jurisdiction of the arbitrators is hereby expressly limited accordingly. The arbitration shall be by a panel of three arbitrators, one of whom must be an attorney at law actively engaged in the practice of his or her profession, and specialized in the area of contract law, for at least ten years.  The procedures to be invoked under this provision shall be as follows:

i) Any Party may request arbitration of any matter in dispute. The Party requesting arbitration shall do so by giving notice to the other Party, specifying in the notice the name and address of a disinterested person designated to act as an arbitrator on its behalf. Within 30 days after the service of such notice, the other Party shall give notice to the first Party specifying the name and address of a disinterested person designated to act as an arbitrator on its behalf. If the second Party fails to notify the first Party of the appointment of its arbitrator within the time above specified, then the appointment of the second arbitrator shall be made in the same manner as hereinafter provided for the appointment of a third arbitrator, in a case where

the two arbitrators appointed and the Parties are unable to agree on such appointment, the two arbitrators so chosen shall meet within 10 days after the second arbitrator is appointed, and they shall together appoint a disinterested person as a third arbitrator. If they are unable to agree upon such appointment within 30 days after the appointment of the second arbitrator, the third arbitrator shall be selected by the Parties themselves if they can so agree within a further 10 days. If the Parties do not so agree, then any Party, on behalf of and on notice to the other(s), may request such appointment by the American Arbitration Association (or any organization successor thereto) in accordance with its rules then prevailing or if the American Arbitration Association (or such successor organization) shall fail to appoint said third arbitrator within 30 days after such request is made, then any Party may apply, on notice to the other, to the appropriate court of the Kingdom of Sweden for the appointment of such third arbitrator. Each arbitrator chosen or appointed pursuant to this Section shall have at least ten years experience in a calling connected to the subject matter of the dispute, and the third arbitrator shall also be a disinterested person.

　　ii. The arbitration shall be conducted, to the extent consistent with this provision, in accordance with the then prevailing rules of Arbitration in Geneva, Switzerland. The arbitrators shall have the right to retain and consult experts and competent authorities skilled in the matter(s) under arbitration but any such consultation shall be made in the presence of both Parties with full right on their part to cross examine such experts and authorities. The arbitrators shall render their award, upon the concurrence of at least two of their number, not later than 90 days after the appointment of the third arbitrator. Their decision and award shall be in writing and counterpart copies shall be delivered to each of the Parties. In rendering their award, the jurisdiction of the arbitrators shall be limited in accord with the provisions set forth above. Judgment may be entered on the award of the arbitrators so rendered.

　　iii. Each of the participating Parties shall pay the fees and expenses of the one of the two original arbitrators appointed by or for such Party, and the fees and expenses of the third arbitrator and all other expenses of the arbitration shall be borne by the Parties equally. Each of the participating Parties shall bear the expense of its own counsel, experts and preparation and presentation of proof.

**Section 1.13:** Where, in any circumstance under this Agreement, the occurrence of an event, or the giving of notice, must take place before arbitration may be invoked, then the occurrence of that event or the giving of that notice (and if the notice be given, that it have been so given, in a timely and proper manner) are hereby in each instance expressly made a condition to invoking arbitration. The jurisdiction of the arbitrators is hereby expressly further limited accordingly.

**Section 1.14:** No party shall be entitled to interrupt the progress of it's respective area of performance under this Agreement pending the determination in an arbitration proceeding.

IN AGREEMENT WHEREOF, each of the aforementioned parties has caused his or her signature to be applied hereunder.

IN PARIS FRANCE
October 6, 2003

_____
Helle A. MADSØ

_____
Patrick SAUTIN

_____
Christian JOHANSEN

_____
Niel STIVEY



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**BOSTON DIVISION**

|  |  |
|---|---|
| **FALKEN INDUSTRIES, LTD. AND ROY JANIS,** | **Civil Action No. 04-12479 MEL** |
| **Plaintiffs,** | |
| **v.** | |
| **CHRISTIAN JOHANSEN AND PATRICK SAUTIN,** | |
| **Defendants.** | |

### DECLARATION OF UNNI FREDHEIM

I, Unni Fredheim, do hereby declare as follows:

1.      I am over the age of twenty-one and I am competent to give the testimony contained in this declaration.

2.      I attended the University of Oslo, Faculty of Law from 1992 and graduated in January 1999. I received an LL.M. degree from Boston University in 2003.  I passed the New York bar exam in 2004 (although I have not yet been sworn in).

3.      I was hired as a jurist at Falken Industries Ltd. in October 2003 by Emile E. Gouiran and Helle Madso who told me they were the number one and number two executives of the company, and hence running the company.

4.      I resigned from Falken Industries Ltd in June 2004 because of what I felt were questionable and possibly unethical business practices.

5.      In 2004, after Patrick Sautin and Christian Johansen left Falken and initiated their lawsuit in the Prud'hommes, Emile Gouiran approached me and asked me if I had any friends or contacts in the United States who would be willing to serve as a named plaintiff in a lawsuit

against Mr. Sautin and Mr. Johansen.  I inquired as to the basis for such a lawsuit.  Mr. Gouiran

conceded to me that Falken probably did not have legitimate claims against Mr. Sautin and Mr.

Johansen, but that he wanted someone to commence suit in the United States against them.  He

stated that it would be difficult and expensive for Mr. Sautin and Mr. Johansen to defend a

lawsuit in the United States.  Mr. Gouiran stated that he hoped commencing a lawsuit against

Mr. Sautin and Mr. Johansen in the United States would force them to abandon their litigation

against Falken in the Prud'hommes.  Mr. Gouiran indicated that he would prefer that the

proposed American plaintiff be a shareholder of Falken, but if we found a person willing to

commence the litigation in the United States who did not happen to be a shareholder, Falken

would give them shares to make them a shareholder and thus a plaintiff with standing.  I objected

to this proposal.

6.      As Emile Gouiran's legal assistant and also assisting Gouiran and Madso in new

business development, I would have been aware of any activities by Falken or Mr. Sautin or Mr.

Johansen to expand into Massachusetts.

7.      To my knowledge, neither Mr. Sautin nor Mr. Johansen had any contacts with

Massachusetts entities during their employment at Falken.

8.      Falken was not dealing with American entities in late 2003, early 2004.  Virtually

all of Falken's business was conducted with European suppliers and customers.

9.      To my knowledge, neither Mr. Sautin nor Mr. Johansen was charged with

responsibility for establishing a supply network or regional office in Massachusetts.

10.     To my knowledge, neither Mr. Sautin nor Mr. Johansen had "significant or

continuous contacts" with Massachusetts real estate brokers, law firms or landlords.

11.    To my knowledge, neither Mr. Sautin nor Mr. Johansen solicited any Massachusetts companies to sell the Clean Plus line of products on behalf of Falken.

12.    Intra-company discussions regarding expanding into Massachusetts occurred much later in 2004, after Mr. Sautin and Mr. Johansen had left Falken, and primarily took place between Mr. Gouiran and Ms. Helle Madso.

13.    To my knowledge, neither Mr. Sautin nor Mr. Johansen had anything to do with Mr. Janis's decision to invest in Falken (if he ever did invest in Falken).  Mr. Gouiran and Ms. Madso were the only Falken representatives with the authority to solicit investors.

14.    To my knowledge, neither Mr. Sautin nor Mr. Johansen absconded with trade secrets, customer lists or proprietary business information.

15.    To my knowledge, neither Mr. Sautin nor Mr. Johansen destroyed electronic business records of Falken or otherwise damaged Falken's computer system.

16.    To my knowledge, neither Mr. Sautin nor Mr. Johansen destroyed records of their day-to-day business responsibilities or activities.

Under the laws of perjury of the United States of America, I do hereby declare that the foregoing is true and correct.


Dated this 5th day of January, 2005.


Unni Fredheim

BIGNON LEBRAY & ASSOCIÉS
SOCIÉTÉ CIVILE PROFESSIONNELLE D'AVOCATS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

| | |
|---|---|
| FALKEN INDUSTRIES, LTD. AND ROY JANIS, <br><br> Plaintiffs, <br><br> v. <br><br> CHRISTIAN JOHANSEN AND PATRICK SAUTIN, <br><br> Defendants. | Civil Action No. 04-12479 MEL |

### DECLARATION OF LAURENCE DEFONTAINE

I, Laurence Defontaine, do hereby declare as follows:

1.    I am over the age of twenty-one and I am competent to give the testimony contained in this declaration.

2.    My office address is 14, rue Pergolèse, 75 116 Paris, France. I am an attorney with Bignon Lebray & Associés Law Firm. I studied law at the University of Paris II – Panthéon Assas. I am licensed to practice law in Paris. I was admitted to the bar in 1992.

3.    I have examined the Complaint filed in the above-captioned matter as well as Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss. I have also examined the *Extrait* K-bis of the company FALKEN INDUSTRIES, Ltd dated January 2$^d$, 2005, and the letters of Mr. Grundler, Mr. Kahan, and Ms. Trolle.

BIGNON LEBRAY & ASSOCIÉS
SOCIÉTÉ CIVILE PROFESSIONNELLE D'AVOCATS

4.    I have been requested to opine in respect of the jurisdictional competence of the French Commercial Courts with regard to the Complaint filed with the United States District Court for the District of Massachusetts by FALKEN INDUSTRIES LTD ("FALKEN") and Mr. Roy Janis against Mr. Patrick Sautin and Mr. Christian Johansen.

5.    However, I insist on the fact that I have strictly limited the present affidavit to my area of competence, i.e. French jurisdiction law rules, since I am not qualified to determine the nature (whether civil, commercial, criminal or related to employment law) of the complaints filed with the United States District Court for the District of Massachusetts by FALKEN INDUSTRIES LTD ("FALKEN") and Mr. Roy Janis against Mr. Patrick Sautin and Mr. Christian Johansen.

6.    As a result, please find below my opinion in respect of the French Commercial Jurisdiction over this matter pending before the United States District Court for the District of Massachusetts.

BIGNON LEBRAY & ASSOCIÉS
SOCIÉTÉ CIVILE PROFESSIONNELLE D'AVOCATS

The French rules on International jurisdiction are aimed, in principle, to individuals and companies. From the outset, I would like to point out that by virtue of Article L.411-4, al.2 of the French Code of Administration of Justice, the Commercial Court has exclusive jurisdiction over issues concerning companies. It is generally and logically admitted, in the line of precedents, that article L. 411-4, al.2 of the French Code of Administration of Justice also applies to issues arising between a company and its directors.

According to French law, one of the main connecting factor for a company to a French Commercial jurisdiction is the place where the company has its place of business or its trading activity (A). The French citizenship of the claimant or the defendant to the proceedings could also be considered, under French law, as a connecting factor (B).

BIGNON LEBRAY & ASSOCIÉS
SOCIÉTÉ CIVILE PROFESSIONNELLE D'AVOCATS

A.     On the territorial competence of the French Commercial Court of the place where the company has its place of business or its trading activity.

- Under French law, the international competence will be determined according to the French domestic rules on territorial competence which are extended in order to apply to international matters. This is a solution widely adopted by the French Commercial Courts

  As a result, according to Articles 42 and 43 of the French Code of Civil Procedure, *"the Court territorially competent shall be, save where contrary provisions shall apply, the one for the situs where the defendant has established his dwelling (...) In relation to a corporate entity the situs where it is established "*

- The rule of law giving jurisdiction to the Court where the defendant has his dwelling (article 42 al. 1er of the French Code of Civil Procedure) does also apply to international matters. French Courts will therefore have jurisdiction owing to the fact that the Defendant has its dwelling in France.

BIGNON LEBRAY & ASSOCIÉS
SOCIÉTÉ CIVILE PROFESSIONNELLE D'AVOCATS

- As far as companies are concerned, the Court territorially competent is (except for legal and conventional exceptions) the one where the company has its registered office[1]. When the registered office of the company is established abroad, such as in the present case, the unbroken line of precedents extends the jurisdiction of French Commercial Courts to foreign companies in the following events :

  > their premises are located in France, or
  > their principal place of business is located in France, or
  > their trading activity is located in France, or
  > the subject matter of the current proceedings is in relation to various mismanagement linked to their activity in France.

Thus, the French Supreme Court held that a French Commercial Court had jurisdiction over a matter between an English company and one of its managers owing to the fact that the latter company did have its principal place of business in France.

This company which had its statutory office in England had nevertheless its principal place of business in France and for that reason the proceedings against it had to be brought before the French Commercial Court[2].

---

[1] French Supreme Court, 12th December 1972, Bull. civ. IV, n°331.

[2] French Supreme Court, 12th May 1959, RTD com 1960, p 243

BIGNON LEBRAY & ASSOCIÉS
SOCIÉTÉ CIVILE PROFESSIONNELLE D'AVOCATS

- In the present case, FALKEN is a foreign company which has its registered office in New Jersey (USA). It is registered in France under the commercial register of Paris under the number B 450 441 183.

- Therefore, according to the foregoing and the documents in my possession, the jurisdiction of the French Courts will have to be extended to FALKEN as it has its principal place of business in France, where the disputed facts occured.

B.    On the connecting factor based on the French citizenship of one of the parties to the proceedings

- By virtue of Article 14 of the French Civil Code, a claimant who is a French citizen shall be able to cite an alien before the French Courts. In addition, Article 15 of the French Civil Code provides that a defendant who is a French citizen shall also be able to bring its proceedings with an alien before the French Courts.

  In the event of co-defendants, it would also be possible to cite in France a defendant who has its dwelling abroad as long as one of the defendants is established in France[3].

---

[3] French Supreme Court, 24, février 1998, Bull. Civ. 1, n°70

BIGNON LEBRAY & ASSOCIÉS
SOCIÉTÉ CIVILE PROFESSIONNELLE D'AVOCATS

It is unanimously established both in doctrine and in the line of precedents that this double exemption of jurisdiction based on the French citizenship does not cover only individuals but also companies.

The leading cases have established that, for the implementation of Article 14 and 15 of the French Civil Code, the nationality of the parties will be taken into account at the day of the commencement of the proceedings.

- **In the present case, by virtue of its French citizenship, Mr. Patrick Sautin would be perfectly allowed, with regard to his issue with FALKEN, to bring the current proceedings to France.**

\*

\*      \*

BIGNON LEBRAY & ASSOCIÉS
SOCIÉTÉ CIVILE PROFESSIONNELLE D'AVOCATS

According to the foregoing, in particular to the above mentioned reserves concerning my area of competence, and to the documents passed on me, the current pending proceedings in the United States could be brought before the French Commercial Courts owing to the fact that :

➢  FALKEN has a permanent autonomous establishment located in Paris, which has a trading activity located in France (cf. Extrait K-bis),

➢  Mr. Patrick Sautin is a French citizen.

In addition to the above, it must be highlighted that should the purported various mismanagement committed by Mr. Sautin and Mr. Johansen be linked to FALKEN's activity in France, French Commercial Courts would have jurisdiction over this current matter pending before the United States District Court for the District of Massachusetts. Such trial could possibly last between 15 and 18 months time in order to get a decision from a Court of first instance.

I do hereby declare under penalty of perjury under the laws of the United State of America that the foregoing is true and correct.

Executed on 5th of January, 2005.

Laurence Defontaine

CLI-1260668v1                                   8

BIGNON LEBRAY & ASSOCIÉS
SOCIÉTÉ CIVILE PROFESSIONNELLE D'AVOCATS

## EXHIBITS

1.   Certificate of Registration at the Commercial Register of Paris (France) of FALKEN INDUSTRIES LTD and its translation in English

2.   Article 42 and 43 of the French Civil Procedure Code and their translation in English

3.   Article L411-4 of the French Code Administration of Justice and its translation in English

4.   Decision of the French Supreme Court dated 12th December 1972 and translation of its statement of reasons in English

5.   Decision of the French Supreme Court dated 12th May 1959 and its translation in English

6.   Decision of the French Supreme Court dated 24th February 1998 and translation of its statement of reasons in English

GREFFE DU TRIBUNAL DE COMMERCE DE PARIS
      1 QUAI DE CORSE
      75181 PARIS CEDEX 04

                          REFERENCE   0700000288/DC000064


              E X T R A I T   K B I S


   IMMATRICULATION AU REGISTRE DU COMMERCE ET DES SOCIETES
      EN DATE DU : 22 OCTOBRE 2003
      NUMERO DE REGISTRE DU COMMERCE :
        R.C.S. PARIS B 450 441 183 (2003B16733)
      EXTRAIT AU : 03 JANVIER 2005

RENSEIGNEMENTS RELATIFS A LA PERSONNE

   RAISON SOCIALE (DENOMINATION) - SIGLE
      FALKEN INDUSTRIES LTD

   FORME JURIDIQUE : SOCIETE DE DROIT ETRANGER

   ADRESSE DU SIEGE
      691 STATE HIGHWAY 33 TRENTON NEW JERSEY 08619 (USA)

   DUREE DE LA SOCIETE : ILLIMITEE
   DATE D'ARRETE DES COMPTES LE 31 DECEMBRE

   CONSTITUTION
      DEPOT DE L'ACTE : LE 22 OCTOBRE 2003 NUMERO 020732 AU GREFFE DU
         TRIBUNAL DE PARIS

ADMINISTRATION

   RESPONSABLE EN FRANCE MONSIEUR MAILLACH PASCAL
      NE(E) LE 20 MAI 1957 COMMUNE DE NAISSANCE PARIS 75014
      ARRONDISSEMENT 14 PAYS FRANCE
      NATIONALITE FRANCAISE
      28 R DES TEMPLIERS 28320 GALLARDON

   RESPONSABLE A L'ETRANGER MONSIEUR GORDON STEVEN
      NE(E) LE 11 JUIN 1955 COMMUNE DE NAISSANCE NEW YORK PAYS
      ETATS-UNIS D'AMERIQUE
      NATIONALITE ETATS UNIS D'AMERIQUE
      FALKEN INDUSTRIES LTD 691 STATE HIGHWAY 33 TRENTON NEW JERSEY
      (USA)

RENSEIGNEMENTS RELATIFS A L'ACTIVITE COMMERCIALE :

   ORIGINE DE LA SOCIETE :  CETTE SOCIETE EST DEJA CONSTITUEE

   ORIGINE DU FONDS :  CREATION D'UN FONDS DE COMMERCE

   ACTIVITE :  EN EXPLOITATION DIRECTE ACHAT VENTE IMPORT EXPORT
      DISTRIBUTION COMMERCIALISATION LOCATION DE TOUS PRODUITS OU

                                              PAGE    01

R.C.S. PARIS B 450 441 183
2003B16733   REFERENCE 0700000288

E X T R A I T   K B I S

EXTRAIT AU 03 JANVIER 2005

MARCHANDISES NON REGLEMENTEES

ADRESSE DU PRINCIPAL ETABLISSEMENT
146 R DU CHATEAU 75014 PARIS

DEBUT D'EXPLOITATION LE  28 AOUT 2003

MODE D'EXPLOITATION :  EXPLOITATION DIRECTE

OBSERVATIONS

EXTRAIT DELIVRE A PARIS              LE 03  JANVIER  2005 SUR    02    PAGES.

TOUTE REPRODUCTION MEME CERTIFIEE CONFORME, DU PRESENT EXTRAIT, EST SANS VALEUR.
================================== FIN DE L'EXTRAIT ==================================
                                              PAGE    02

Le mot "ORIGINAL" ci-dessus signifie que vous êtes en présence d'un original émanant du greffe

Translation from French into English :

Certificate of Registration

REGISTRATION AT THE COMMERCIAL REGISTER

Certificate dated 2nd January 2005

## IDENTIFICATION

| | |
|---|---|
| Business name: | FALKEN INDUSTRIES LTD |
| Identification Number: | 450 441 183 RCS PARIS |
| RCS Number: | 2003 B 16733 |
| Registration Date: | 22nd October 2003 |

## INFORMATION RELATED TO THE LEGAL ENTITY

| | |
|---|---|
| Legal form : | Foreign Corporation Entity |
| Registered Office's location : | 691 STATE HIGHWAY 33 TRENTON NEW JERSEY 08619 (USA) |
| Length of the Company : | Unlimited |
| Date of acceptance of the account rendered: | 31st December |
| Founding -<br>Filing of the certificate in the registry : | At the registry of the Paris Commercial Court on 22nd October 2003 under the number 20732 |

## ADMINISTRATION

EXECUTIVE IN FRANCE

Mr. MAILLACH PASCAL
Born on 20th May 1957 in Paris 75014 (FRANCE)
French Nationality
Living 28 R DES TEMPLIERS 28320 GALLARDON

EXECUTIVE ABROAD                     Mr. GORDON STEVEN
                                     Born on 11th June 1955 in New York (UNITED
                                     STATES OF AMERICA)
                                     American Nationality
                                     Living FALKEN INDUSTRIES LTD 691
                                     STATE HIGHWAY 33 TRENTON NEW
                                     JERSEY (USA)

## INFORMATION RELATED TO THE BUSINESS ACTIVITY

Origin of the Company :                This Company is already constituted

Origin of the Business :               Creation of a business

Activity :                             OPERATING, PURCHASE, SALE, IMPORT,
                                       EXPORT,                DISTRIBUTION,
                                       COMMERCIALISATION, LEASING EVERY
                                       TYPE OF PRODUCTS OR GOODS NOT
                                       REGULATED

Location of the Place of Business :    146 R DU CHATEAU 75014 PARIS

Beginning of the Operating on :        28th August 2003

Operating Mode :                       Direct Working

OBSERVATIONS

CERTIFICATE DELIVERED IN PARIS         ON 3rd January 2005    02    PAGES

**End of the Certificate**

## NOUVEAU CODE DE PROCEDURE CIVILE

### Article 42

*(Décret n° 81-500 du 12 mai 1981 art. 7 Journal Officiel du 14 mai 1981 rectificatif JORF 21 mai 1981)*

La juridiction territorialement compétente est, sauf disposition contraire, celle du lieu où demeure le défendeur.

S'il y a plusieurs défendeurs, le demandeur saisit, à son choix, la juridiction du lieu où demeure l'un d'eux.

Si le défendeur n'a ni domicile ni résidence connus, le demandeur peut saisir la juridiction du lieu où il demeure ou celle de son choix s'il demeure à l'étranger.

# NOUVEAU CODE DE PROCEDURE CIVILE

**Article 43**

Le lieu où demeure le défendeur s'entend :
- s'il s'agit d'une personne physique, du lieu où celle-ci a son domicile ou, à défaut, sa résidence,
- s'il s'agit d'une personne morale, du lieu où celle-ci est établie.

## Translation of Article 42 of the French Civil Procedure Code

(Decree No. 81-500 of 12 May 1981, Sec. 7, Official Journal of 14 May 1981, amendment JORF of 21 May 1981)

*"The Court territorially competent shall be, save where contrary provisions shall apply, the one for the situs where the defendants has established his dwelling.*

*Where there are several defendants, the claimant shall seise, at his choice, the court of the situs where one of them has established his dwelling.*

*Where the defendants has no known domicile or known residence, the claimant may seise the court of the situs where he has established his dwelling or anyone of his choice where he has established his dwelling in a foreign country."*

## Translation of Article 43 of the French Civil Procedure Code

*"Where the defendants has established his dwelling shall mean:*

*- in relation to a natural person, the situs where he has his domicile or, in default thereof, his residence,*

*- in relation to a corporate entity, the situs where it is established."*

## CODE DE L'ORGANISATION JUDICIAIRE
### (Partie Législative)

**Article L411-4**

*(Loi n° 87-550 du 16 juillet 1987 art. 1 Journal Officiel du 19 juillet 1987 en vigueur le 1er janvier 1988)*

*(Loi n° 2001-420 du 15 mai 2001 art. 127 Journal Officiel du 16 mai 2001 en vigueur le 19 décembre 1991)*

Les tribunaux de commerce connaissent :
1° Des contestations relatives aux engagements entre commerçants, entre établissements de crédit ou entre eux ;
2° Des contestations relatives aux sociétés commerciales ;
3° De celles relatives aux actes de commerce entre toutes personnes.
Toutefois, les parties peuvent, au moment où elles contractent, convenir de soumettre à l'arbitrage les contestations ci-dessus énumérées.

### Translation of Article L411-4 of the French Code of Administrative Justice

(Law n°87-550 of 16th July 1987 art.1 , Official Journal of 19th July 1987 in force on 1st January 1988)
(Law n°2001-420 of 15 May 2001 art. 127 Official Journal of 16th May 2001 in force on 19th December 1991)

" The commercial court will have jurisdiction over :
1° disputes related to the commitment between trader, between financial institution or between them ;
2° disputes in relation to commercial companies ;
3° disputes related to legal transactions governed by commercial law between every persons.

However, the parties could, at the time they enter into a contract, agree to submit to arbitration the disputes mentioned above."

QUATRIÈME PARTIE. — CHAM

N° 70-14.102.    *Caisse de Prévoyance des industries métallurgiques mécaniques et connexes contre Sté des Ateliers et Chantier du Havre Duchesne et Bossière et Augustin Normand réunis.*

Président : M. Monguilan. — Rapporteur : M. Portemer. — Avocat général : M. Toubas. — Avocats : MM. Cail et Gauthier.

## N° 331

**SOCIETE EN GÉNÉRAL. — Siège social. — Caractère fictif. — Appréciation souveraine des juges du fond.**

*Les juges du fond apprécient souverainement le caractère réel ou fictif du siège social d'une société.*

*12 décembre 1972.    Rejet.*

Sur le moyen unique :

Attendu qu'il est reproché à l'arrêt attaqué (Pau, 19 février 1971), d'avoir dit le tribunal de commerce de Bayonne compétent pour statuer sur l'action en paiement dirigée par trois créanciers de la société anonyme l'Abidjanaise contre Badiola et Rodrigo, déclarés responsables par un arrêt antérieur d'une partie du passif de cette société, en liquidation, respectivement en leur qualité de président-directeur général et d'administrateur, alors, selon le pourvoi, qu'en matière de société le juge compétent est celui du lieu où la société est établie, que la société l'Abidjanaise ayant son siège social et de liquidation à Abidjan, de l'accord unanime de tous les actionnaires qui en ont attribué expressément compétence au juge abidjanais, et l'action ayant le caractère d'action sociale, l'arrêt attaqué ne pouvait, sans méconnaître les dispositions des articles 59 et 420 du Code de procédure civile, et la libre volonté des parties, attribuer compétence à d'autres tribunaux que ceux acceptés par les parties ;

Mais attendu que l'arrêt déclare que le siège d'Abidjan doit être considéré comme un siège fictif et que le lieu du siège effectif de la société l'Abidjanaise se trouve à Saint-Jean-de-Luz ; que, par cette constatation, la Cour d'appel n'a fait qu'user de son pouvoir souverain pour statuer dans les limites des conclusions dont elle était saisie, et qu'ainsi le moyen n'est pas fondé ;

PAR CES MOTIFS :

REJETTE LE POURVOI formé contre l'arrêt rendu le 19 février 1971 par la Cour d'appel de Pau.

N° 71-11.682.    *Badiola et autre contre Sté Comptoir Frigorifique de l'Ouest Cofrilo et autres.*

Président : M. Monguilan. — Rapporteur : M. Portemer. — Avocat général : M. Toubas. — Avocats : MM. Martin-Martinière et Cil.

in Bull. Civ. IV 19

TRANSLATION FROM FRENCH INTO ENGLISH

*DECISION, COUR DE CASSATION -*
*12 DECEMBER 1972*

**Translation of the statements of reasons of the decision (second Paragraph of the decision) :**

*" But whereas the order declares that the Registered Office in Abidjan has to be considered as a fictional registered office and that the place of the real registered office of the "Abidjanaise" Company is located at St-Jean- de-Luz. In view of this finding, the Court of Appeal has used its supreme power in order to proceed within the boundaries of the summons for which it was referred, and the plea is therefore without foundation."*

*
* *

Case 1:04-cv-12479-MEL    Document 15-10    Filed 01/05/2005    Page 21 of 25

Conflits de juridiction. — Litige entre étrangers. — Société défenderesse possédant en France un domicile de fait.

Cour de Cassation, Chambre civile, 1re Section civile, — 12 mai 1959. — The Commercial Company of Salonica c. Misrachi.

Un Italien, domicilié en Suisse, peut assigner en France une société anglaise en paiement de sommes dues pour avoir dirigé des services établis en territoire hellénique. Le contrat, dont l'exécution devait lien au territoire français, et le contrat d'un domicile de fait suffisamment possédé en France où la société avait été assignée.

« Attendu qu'il résulte des termes du même est cité :

« § 1er que la O.C.S. a toujours eu établissement principal, où il est adressé, qui se trouvait sur le territoire français, où il est adressé, qui se trouvait sur le territoire principal, où il est adressé que la O.C.S. a toujours son établissement principal, où il est adressé, qui se trouvait et certaine conseil d'administration se réunissaient et certaine conseil d'administration se

---

Conflicts of jurisdiction. — Proceedings between foreigners. —
Defendant company possessing a domicile of fact in France. —
1959. — The Commercial Company of Salonica v. Misrachi.

An Italian subject, domiciled in Switzerland may summon an English Company in France for the payment of sums due for managing the business established in Greek territory, where this contract whose execution gives rise to the proceeds was made in France where the company possessed a sufficiently well defined domicile of fact.

« Whereas it is expressly stated by the order challenges: —

« § 1er that the O.C.S. has always had in Paris « a principal establishment, where 1 its address and 1 it or more kept, where the general counsels were drawn, up and where the directors and certain boards of directors met » :

---

En tous cas, sur le terrain de l'ordre public, l'inobservation du délai imposé par l'un des articles susvisés de la décision étrangère, rendue par des juges français, ne pourrait avoir en France une solution contraire, si le tribunal allemand reconnaissant la décision, déclare un domicile de fait suffisamment caractérisé.

Qui signalons, enfin à propos de la deuxième espèce que le tribunal ne refuse à partie, s'offrira pas à un notaire pour procéder à la liquidation des intérêts des parties, s'offrira pas à un notaire pour procéder à la liquidation des intérêts des parties, c'est présentement se Venezuela et les juges pour d'intérêts à répartir ou jurisprudence.

166          JURISPRUDENCE                          FRANCE.          167

« 2° enfin que les termes de l'article 8 des statuts de la société établissent le siège de celle-ci en Angleterre, mais que les affaires de ladite société seraient exclusivement administrées, dirigées et contrôlées, ou ailleurs à l'étranger suivant décision du conseil ;

« Attendu qu'en ce qui concerne ces constatations, c'est à bon droit que la Cour d'appel a décidé que les contrats litigieux ayant été valablement conclus entre le Directeur Général de la Société et l'important centre parisien de l'O.C.R., cette dernière pouvait, dès lors, en cas de difficultés nées desdits contrats, être valablement assignée devant la juridiction française dans le ressort du centre parisien, seul établissement important de la société en France ... »

---

**Conflits de juridictions.** — Défendeur étranger sans domicile ni résidence en France. — Autres défendeurs domiciliés en France. — Compétence des tribunaux français (oui).

**Litispendance.** — Tribunal étranger saisi par le même demandeur (non).

*Tribunal de grande instance de la Seine, 3e Chambre. — 5 mai 1959. — M. Wilson c. Sté Allied Artists and United Artists Corporation, Metro-Goldwyn-Mayer et Sté nouvelle des Ets Gaumont. — D. 1959, J. 235.*

---

"2° that under the terms of Article 8 of the Articles of Association of the Company, its registered office is situated in England, but that the headquarters of the said company should be exclusively carried on, conducted and managed at Salonica or elsewhere abroad according to the decision of the Board;

"And whereas the Articles of Association thus distinguish the registered office, situated in England, from the management, conduct, direction and control of the business, all matters carried on exclusively abroad;

"And whereas, in view of these findings, the Court of Appeal rightly decided that the contracts in issue were regularly made between the Managing Director of the Company and the important Paris centre of the O.C.R., the letter could therefore, in the event of difficulties arising out of the said contract, be validly summoned before the French jurisdiction ..."

---

**Conflicts of Jurisdiction.** — Foreign defendant with no domicile or residence in France. — Other defendants domiciled in France. — Competence of the French Courts (upheld).

**Lis pendens.** — Foreign Court seized by the same plaintiff (negatived).

*Tribunal de Grande Instance de la Seine, Third Chamber. — 5 May 1959. — M. Wilson v. Sté Allied Artists and United Artists Corporation, Metro-Goldwyn-Mayer and Sté Nouvelle des Ets Gaumont. — D. 1959, J. 235.*

AN American national, composing in France, an American company which had registered offices was to the United States, another American company which had its establishment in France, and a French company, to have his name appear in the credit titles of a film ...

BIU CUJAS CERDOC       4. JAN. 2005 18:16

TRANSLATION FROM FRENCH INTO ENGLISH

### *DECISION COUR DE CASSATION, -*
### *12 MAY 1959*

*"Whereas it is expressly stated by the order challenged:*

*"1. that the C.C.S. has always had in Paris "a principal establishment, where it is alleged that the records are or were kept, where the general accounts were drawn up and where the directors and certain boards of directors met";*

*"2. that under the terms of Article 8 of the Articles of Association of the Company, its registered office is situated in England, but that the business of the said company shall be exclusively carried on, conducted and managed at Salonica or elsewhere abroad according to the decision of the Board;"*

*"And whereas the Articles of Association, thus distinguish the registered office, situated in England from the management, conduct, direction and control of its Wbusiness, all matters carried out exclusively abroad."*

*"And whereas, in view of these findings, the Court of Appeal rightly decided that the contract in issue was regularly made between the Managing Director of the company assisted by another Director of the one part and Misrachi of the other part, at the important Paris centre of the C.C.S., the latter could therefore in the event of difficulties arising out of the said contract, be validly summoned before the French Court within whose jurisdiction the company possessed a sufficiently well marked domicile of fact; and the first branch of the plea is therefore without foundation."*

\*
\* \*

qui n'a pas été prorogé ; qu'elle en a exactement déduit que ces engagements étaient devenus caducs, et que le gage, qui en était l'accessoire, se trouvait privé de cause ; que le moyen se heurte à l'appréciation souveraine des juges du fond quant à l'expression d'un appel ou d'une prorogation des garanties ainsi que de l'étendue de l'exécution du contrat par la société Butec ;

Que le moyen n'est pas fondé ;

PAR CES MOTIFS :

REJETTE le pourvoi.

N° 95-19.442.                    *Société Rafidain Bank et autre*
                              *contre société Butec et autre.*

*Président :* M. Lemontey. – *Rapporteur :* M. Ancel. – *Avocat général :* M. Gaunet. – *Avocats :* la SCP Gatineau, la SCP Célice, Blancpain et Soltner.

A RAPPROCHER :

1re Civ., 23 octobre 1990, Bull. 1990, I, n° 219, p. 156 (cassation), et les arrêts cités.

## N° 70

**CONFLIT DE JURIDICTIONS. – Compétence internationale des juridictions françaises. – Application des règles françaises internes à l'ordre international. – Compétence territoriale. – Prorogation de compétence. – Conditions. – Lien étroit de connexité entre les demandes.**

*Justifie légalement sa décision d'incompétence de la juridiction française la cour d'appel qui constate que le tribunal français est saisi d'une demande d'une société étrangère contre une banque française et contre des sociétés étrangères ayant donné leur garantie, et retient que la première demande, tendant à la fixation du prix d'un contrat de construction, est étrangère à la demande en nullité des garanties, de sorte que la prorogation de compétence, applicable dans l'ordre international, édictée par l'article 42, alinéa 2, du nouveau Code de procédure civile, ne pouvait pas jouer en l'espèce, à défaut de lien suffisant entre les diverses demandes.*

**24 février 1998.**                                    **Rejet.**

Sur le moyen unique, pris en ses deux branches :

Attendu que la société slovaque Intertour fait grief à l'arrêt attaqué (Paris, 5 juillet 1995) d'avoir déclaré la juridiction française incompétente pour statuer sur sa demande, dirigée notamment contre les sociétés Ceskoslovenska Obchodni Banka (CSOB), ayant son siège à Prague, et Vseobecna Uverova Banka (VUB), ayant son siège à Bratislava, qui s'étaient portées garantes de billets à ordre émis par la société Intertour à l'occasion d'un contrat portant sur la construction, pour son compte, d'un hôtel à Bratislava par la société française Compagnie générale de bâtiment et de construction (CBC), et

déposés à la Banque commerciale pour l'Europe du Nord à Paris, également assignée devant le tribunal de commerce de Paris ; qu'il est reproché à la cour d'appel d'avoir omis de se prononcer sur la nature des garanties litigieuses, afin de faire application, s'agissant d'un cautionnement, de la règle de l'article 42, alinéa 2, du nouveau Code de procédure civile, qui permet d'attraire plusieurs défendeurs devant le tribunal du lieu du domicile de l'un d'eux ; que la cour d'appel aurait, en outre, méconnu la demande en affirmant que la société Intertour demandait l'annulation du contrat de base conclu avec la société CBC, alors que sa demande visait la nullité des billets à ordre en raison de leur endossement frauduleux ;

Mais attendu que la prorogation de compétence prévue par l'article 42, alinéa 2, du nouveau Code de procédure civile, applicable dans l'ordre international, suppose que les diverses demandes, dirigées contre des défendeurs différents, soient dans un lien étroit de connexité ; qu'à cet égard la cour d'appel, qui a retenu, sans méconnaître l'objet du litige, que la demande de la société Intertour à l'égard de la BCEN, qui tendait à faire fixer le nouveau montant du prix du contrat, était étrangère à l'action exercée contre les sociétés CSOB et VUB pour faire juger la nullité de leurs garanties, dont la nature devait être déterminée conformément aux lois auxquelles ces conventions étaient soumises, a légalement justifié sa décision, dès lors que le lien exigé pour l'application du texte susvisé n'existait pas en l'espèce ;

PAR CES MOTIFS :

REJETTE le pourvoi.

N° 95-20.627.                        *Société Intertour*
            *contre société Ceskoslovenska Obchodni Banka*
                                        *et autres.*

*Président :* M. Lemontey. – *Rapporteur :* M. Ancel. – *Avocat général :* M. Gaunet. – *Avocats :* la SCP Delaporte et Briard, la SCP Célice, Blancpain et Soltner, M. Guinard.

A RAPPROCHER :

1re Civ., 8 février 1983, Bull. 1983, I, n° 51 (1), p. 44 (rejet) ;
1re Civ., 24 février 1998, Bull. 1998, n° 69, p. 46 (rejet), et l'arrêt cité.

## N° 71

**CONVENTIONS INTERNATIONALES. – Accords et conventions divers. – Convention européenne de sauvegarde des droits de l'homme et des libertés fondamentales. – Protocole additionnel n° 7. – Interprétation. – Article 5. – Régime matrimonial. – Liquidation et partage. – Application.**

*Il résulte de l'article 5 du protocole du 22 novembre 1984, n° 7, à la Convention européenne des droits de l'homme que les époux jouissent de l'égalité des droits entre eux durant le mariage et lors de sa dissolution.*

*Viole ce texte, qui s'impose directement au juge français à qui il appartient de rétablir l'égalité des droits entre les époux, une cour d'appel, qui fait application des*

47

TRANSLATION FROM FRENCH INTO ENGLISH

### *DECISION, COUR DE CASSATION*
### *24 FEBRUARY 1998*

**Translation of the statements of reasons of the decision (second Paragraph of the decision) :**

*"But whereas the extension of jurisdiction provided by Article 42, 2 of the New Civil Procedure Code, which applies to international matters, assume that the various claims issued against different defendants shall be with each other in close connection"*

\*
\*  \*